331 So.2d 207 (1976)
Mabel Cecelia Michlels BROWN et al., Plaintiffs-Appellees,
v.
SOUTHERN VENTURES CORPORATION et al., Defendants-Appellants.
No. 5406.
Court of Appeal of Louisiana, Third Circuit.
April 14, 1976.
Rehearing Denied May 17, 1976.
Writ Refused July 2, 1976.
*208 Stafford, Randow, O'Neal & Scott by Grove Stafford, Jr., Alexandria, for defendants-appellants.
Gold, Hall, Hammill & Little by James D. Davis, James S. Gravel, Alexandria, for plaintiffs-appellees.
Before DOMENGEAUX, WATSON and CUTRER, JJ.
DOMENGEAUX, Judge.
This is a wrongful death action tried by jury. Plaintiffs are the surviving spouse and children of the decedent, James Brown. Defendants are Southern Motor Lodges of Alexandria, Inc., lessee and builder of the Howard Johnson's Motor Lodge in Alexandria, Louisiana, and Insurance Company of North America, its liability insurer. Southern Ventures Corporation, the landowner and lessor of the premises was originally made a party defendant but filed a motion for summary judgment which was sustained by the trial judge.[1] The jury awarded plaintiffs the sum of $161, 679.30. From this judgment the defendants have appealed. We affirm.
The pertinent facts of this case are as follows:
On the afternoon of January 14, 1973, a party was given by some Alexandria businessmen and their wives at the Bayou Room of the Howard Johnson's Motor Lodge in that city. The party was to coincide with the "Superbowl" football game and was given for the purpose of watching that contest amid friends. At approximately 2:30 P.M. the decedent, James Brown, arrived at the gathering and began to mill about and enjoy himself. Liquor flowed freely at the party and there is evidence that Mr. Brown indulged, but no one testified that he was noticeably intoxicated. During the party a number of the guests, including Mr. Brown, noticed and commented upon a phenomenon created by a combination of the pool lights and by steam rising from the motel swimming pool some ninety-three feet away and visible from the Bayou Room. At one point during the evening the decedent and another guest planned to walk over to the pool and observe it more closely but for some reason abandoned the idea. At about 7:00 P.M. Mr. Brown and another man who remained unidentified entered the motel restaurant and each had two cups of coffee. The *209 manager of the restaurant knew Mr. Brown and testified that he was talking rather loudly about the game with his companion but that neither man gave the impression that he was intoxicated. No one saw Mr. Brown after he left the restaurant sometime after 7:00 P.M. At approximately 1:30 A.M. a city policeman found the decedent's body floating in the shallow end (four feet) of the motel swimming pool which is located near the restaurant. The coroner ruled that the cause of death was drowning. There were no witnesses.
The defendants raise the following specifications of error:
1. The jury erred in finding the proximate cause of Mr. Brown's death to be the allegedly dangerous condition existing around the motel swimming pool.
2. The jury erred in failing to find that Mr. Brown's alleged intoxication contributed substantially to his death.
3. The trial judge erred in allowing the jury to see photographs of the scene which were allegedly posed and unrepresentative.

THE MOTEL'S NEGLIGENCE
In order to determine the duty owed to the decedent by the defendants while on the latters' premises, we must first ascertain the status which the decedent enjoyed while at the motel.
In the case of Savoy v. G. F. Poole Mortuary, 60 So.2d 108 (La.App. 1st Cir. 1952), the "invitee" was described in the following manner:
". . . an invitation to enter upon or use premises may be express or implied, and an invitation may be implied when the owner or occupant engages in some business which fairly indicates to the person entering the premises that his entry and use of the property is consistent with the intentions and purposes of the owner or occupant."
See also the cases of Mills v. Heidingsfield, 192 So. 786 (La.App. 2nd Cir. 1939), writ denied January 9, 1940; and Mercer v. Tremont, 19 So.2d 270 (La.App. 2nd Cir. 1944), writ denied October 3, 1944.
Mr. Brown entered onto the motel property at the express invitation of his hosts, occupants of the Bayou Room. The Bayou Room is a large room used almost exclusively for parties of this type. Under the test set forth in Savoy, supra, we find that the motel acted in such a fashion so as to clearly indicate its intentions that the room and motel premises be used as they were by the persons attending the "Superbowl" party. Furthermore, we find that after the termination of the party Mr. Brown became a paying customer in his own right when he purchased coffee in the restaurant. For these reasons, we are firmly of the opinion that Mr. Brown was a member of that class of persons deemed "invitees" as far as his relationship with the motel was concerned.
Under our jurisprudence the duty owed to an invitee is that of exercising reasonable and ordinary care including maintaining the premises in a reasonably safe and suitable condition and warning invitees of any hidden or concealed perils which are known or reasonably discoverable. Currington v. Great American Insurance Company, 281 So.2d 150 (La.App. 3rd Cir. 1973), writ refused October 12, 1973; Foggin v. General Guaranty Insurance Company, 250 La. 347, 195 So.2d 636 (1967); Alexander v. General Accident Fire and Life Assurance Group, 98 So.2d 730 (La.App. 1st Cir. 1957), writ denied February 10, 1958.
On the afternoon of the decedent's funeral, approximately two days after his death, some members of his family visited the scene of the drowning. They discovered that much of the coping or slanted tile border (which extends approximately one inch over the edge of the pool wall) around the edge of the pool was loose and in a somewhat shaky or wobbly condition. In fact, *210 one member of this party testified that all of the coping on the shallow end of the pool was loose. Mr. C. E. Ewing, Jr., a former swimming pool contractor, and now a swimming pool maintenance man, testified that he had inspected the Howard Johnson's pool in 1972 or 1973, and found that approximately 25% of the cement coping around the pool had to be replaced and that some pieces were completely loose. There was also some conflicting testimony as to the effect of standing on a piece of loose coping. One individual testified that he did not think the coping would be shaky or wobbly if a person stood on it, while others testified to the contrary. An employee of the motel. Raymond Gaines, testified that he noted some loose coping and reported that condition to the motel manager some time prior to Mr. Brown's death, however, the motel manager denies that such information was communicated to her. We find that the opinion of the majority of those witnesses who testified was that uncemented or loose coping would be more hazardous to an individual standing on it than coping which would be firmly cemented.
Portions of the decedent's clothing were introduced at trial and revealed a pair of pants with a slight tear in the knee, a shoe with one of the heels partially knocked off, and a scratch on the crystal of his new wrist watch. The investigating officer found two small pools of water at the northwest corner of the swimming pool. There was also some evidence that the decedent had a bruise on his head. As to the exact cause of death, Doctor Edward C. Uhrich, the physician who performed the autopsy testified as follows:
"Now, there is a condition and this could fit this case very well, where the man fell into the water and on a real cold night, and if you will check the records, it was about 36 degrees that night. He fell into the pool and I maintain thator I think that he had an laryngeal spasm. I think thatuhthat the epiglottis here cut off his air instantly and he had no chance at all, of swimming or yelling or doing anything. I think he died from a laryngeal spasm and this hisuhas he died, almost instantly, I think the lungs filled up with water, and all the other things happened. That's an honest opinion. That's what I told the coroner and that's what I believe and there's nobody here can shake me out of that."
Confronted with the above outlined circumstantial evidence, the jury was forced to make a determination of the causation of Mr. Brown's death.
We find that the principle of res ipsa loquitur as set forth in the case of Boudreaux v. American Insurance Company, 262 La. 721, 264 So.2d 621 (La.1972) particularly applicable to this case. In Boudreaux the Supreme Court stated:
"In this respect, the principle of `resipsa loquitur' (the thing speaks for itself) sometimes comes into play as a rule of circumstantial evidence, whereby negligence is inferred on the part of a defendant because the facts indicate this to be the more probable cause of injury in the absence of other as-plausible explanation by witnesses found credible. [Citations omitted] Thus, by this principle where properly applied, the circumstantial evidence indicates that the injury was caused by some negligence on the part of the defendant, without necessarily proving just what negligent act caused the injury.
. . . . . .
. . . we have in our most recent decision on the issue noted that the real test of applying res ipsa loquitur to be as follows: `Do the facts of the controversy suggest negligence of the defendant, rather than some other factors, as the most plausible explanation of the accident?' Pilie v. National Food Store, 245 La. 276, 158 So.2d 162, 165 (1963)."
In light of the duty which the motel owed Mr. Brown as an invitee we find *211 a reasonable basis in the evidence to support the jury's determination that the motel breached said duty when it failed to maintain the pool in a safe condition or at least warn Mr. Brown of the potential danger attendant thereto. Furthermore, in applying the above cited doctrine of Boudreaux, we cannot say that the jury committed manifest error in determining that the dangerous condition in existence around the motel pool was the "most plausible explanation" of the causation of Mr. Brown's entry into the pool.

DECEDENT'S CONTRIBUTORY NEGLIGENCE
A blood alcohol test performed on the decedent at the time of the autopsy indicated that Mr. Brown had a blood alcohol content of .17% at the time of his death. There was conflicting testimony as to the exact degree of impairment which accompanies such a level of intoxication. There was also testimony by an eminent expert in the field of alcohol studies and its effect upon the human organism who concluded that the type of test employed by the physician who performed the autopsy as well as the manner in which the test was done created a serious doubt in his mind as to the accuracy of the results reached. Most of the experts were of the opinion that even if the decedent had been intoxicated to a level of .17% he would have been able to swim or at least climb out of the swimming pool. There was also testimony by persons attending the party and the manager of the coffee shop who said that Mr. Brown did not give the appearance of being intoxicated nor did his faculties appear to be noticeably impaired. While one might speculate that a person who had not been drinking might have been less likely to fall into the swimming pool, such a conclusion is not necessarily supported by the evidence. The following special interrogatory was propounded to the jury: "Was James Francis Brown guilty of any negligence which proximately caused or contributed to his drowning?" The jury returned a negative response to this inquiry. Thus the jury specifically considered the issue of contributory negligence and found that although Mr. Brown had apparently been drinking, he was not intoxicated to such a degree as to cause or contribute to his death. After a careful review of the evidence we are unable to say that the jury committed manifest error in its determination of this issue." [2]

PHOTOGRAPHS
Over objection by the defendants, the trial judge allowed several photographs to be admitted into evidence. The photographs were taken by members of the decedent's family at the scene of the drowning on the day of Mr. Brown's funeral, approximately two days after his death. These photographs showed the coping around the swimming pool and particularly stressed the fact that a number of the pieces were loose or uncemented. In a number of the pictures different individuals actually lifted various pieces of coping to demonstrate their loose condition. The defendants argue that the pieces of coping were in place at the time of the drowning and that the photographs showing a number of the pieces lifted or askew misled the jury into believing that such a condition existed on the night of Mr. Brown's death.
The individual who took the photographs testified that none of the pieces were out *212 of place when he arrived upon the scene and that sections of the coping were removed merely to demonstrate the fact that they were loose. Before allowing the jury to view the photographs in question the judge gave the following admonition:
"I am going to admit [the photographs] with this admonition to you, you have heard the testimony of the witness and as the picture is shown to you, you are advised to recall that his testimony as [sic] to the events prior to the taking of the picture and how the coping happen [sic] to be in the position that it is in at the time the picture was taken."
In the case of Messex v. Louisiana Department of Highways, 302 So.2d 40 (La. App. 3rd Cir. 1974) we stated:
"The fact that there are differences or changes in conditions does not necessarily exclude a photograph where the changes or differences are explained, so that the photograph, as explained, gives a correct understanding of the condition existing at the time to which the controversy relates."
Also relevant is the case of Fuqua v. Martin, 47 So.2d 404 (La.App. 2nd Cir. 1949) in which it was held that:
". . . in the absence of a showing that the party offering the photograph was guilty of bad faith in making the pictures and staging the objects shown at the scene, photographs of the locale should be admitted when properly identified and offered in evidence. The opposing litigant has the right, of course, to bring out the diffences in conditions and circumstances between the time of the accident and the taking of the picture, both by cross-examination of the witness presenting the photographs and by other competent evidence."
We are of the opinion that the individuals taking the photographs did not lift the sections of coping in an attempt to mislead the jury into believing that such a condition existed at the time of the drowning. Rather, it appears that this deviation from the actual condition was made for the purpose of demonstrating the fact that the copings were loose enough to be lifted by hand. A swimming pool expert also testified that such copings do not become uncemented overnight, but that the loosening process takes place over a period of time. Thus it is reasonably apparent that the condition of the copings did not change substantially in the two day period between the drowning and the taking of the photographs. In view of the testimony elicited relative to the photographs and the trial judge's admonition to the jury, we find no error in the trial judge's admission of the photographs into evidence.
For the above and foregoing reasons the judgment of the district court is affirmed in all respects.
Costs of this appeal are assessed against the defendants-appellants.
AFFIRMED.
NOTES
[1] Southern Ventures Corporation is not a party to this appeal.
[2] We are aware of the recent Louisiana Supreme Court decision in Callais v. Allstate Insurance Company, 334 So.2d 692, La.1975, and in which a rehearing has been granted. Callais holds in essence that when a person has negligently caused his own death, those survivors named in C.C. Article 2315(3) have a cause of action for the damages they have suffered as a result of his death. If the decision stands, the question of Mr. Brown's contributory negligence may become academic. However, we find it unnecessary to rely on the rule enunciated in Callais, in determining the issue of contributory negligence in the instant litigation.